## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Case No.: _____

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY, and GEICO CASUALTY
CO.,

                Plaintiffs,

    -v-

TAMPA BAY MEDICAL REHAB INC.,
YUSDANIA AMARO, A.P.R.N., LUIS MIRANDA-
GENARO, M.D., ELLENA LOIS BODDIE, M.D.,
SUNSKY MEDICAL REHAB CENTER INC, JOSE
V. PUJOLS, and LUIS AUGUST LOGRONO, M.D.,

                Defendants.

_____

**Jury Trial Demand**

## **COMPLAINT**

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co.,

GEICO General Insurance Company, and GEICO Casualty Co. (collectively

"GEICO" or "Plaintiffs") hereby allege as follows:

1.     This action seeks to recover more than $1,400,000.00 that the respective

Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent

and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance

charges through Tampa Bay Medical Rehab, Inc. ("Tampa Bay Medical") and Sunsky

Medical Rehab Center Inc ("Sunsky") for purported patient examinations, physical therapy services, home medical equipment ("HME") and related services and goods (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.    As set forth herein, the Defendants never were entitled to PIP insurance reimbursement in connection with the billing they submitted to Plaintiffs, because:

(i)    at all relevant times, the Defendants operated in violation of Florida law, including: (a) the licensing and operating requirements set forth in Florida's Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"); (b) Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"); and (c) Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"), thereby rendering their PIP insurance charges noncompensable and unenforceable;

(ii)    in many cases, Tampa Bay Medical and Sunsky unlawfully billed GEICO for "physical therapy" services performed by massage therapists and unlicensed/unsupervised individuals;

(iii)    in many cases, the billing submitted through Tampa Bay Medical and Sunsky misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and was submitted in violation of the billing requirements set forth in the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law");

(iv)    the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insured who purportedly were subjected to them;

(v)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to fraudulently inflate the charges submitted to GEICO; and

(vi)    in many cases, the Fraudulent Services were not legitimately provided in the first instance.

3.     As such, the respective Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Tampa Bay Medical and Sunsky.

4.     The Defendants at all relevant times have known they were not entitled to receive payment on the PIP insurance claims that they submitted to Plaintiffs because of the fraudulent and unlawful activities described herein.

5.     The charts annexed hereto as Exhibits "1" – "2" set forth large, representative samples of the fraudulent that have been identified to date that the Defendants have submitted through Tampa Bay Medical and Sunsky to GEICO by mail.

6.     The Defendants' interrelated fraudulent and unlawful schemes began no later than 2020, and have continued uninterrupted since that time. As a result of the Defendants' fraudulent and unlawful schemes, GEICO has incurred damages of more than $1,400,000.00.

## THE PARTIES

## I.    Plaintiffs

7.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and issue automobile

insurance policies in Florida.

## II.   Defendants

8.   Defendant Tampa Bay Medical is a Florida corporation with its principal place of business in Tampa, Florida. Tampa Bay Medical was incorporated in Florida on or about March 3, 2003, was owned and controlled by Yusdania Amaro, A.P.R.N. ("Amaro"), and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

9.   Defendant Amaro resides in and is a citizen of Florida. Amaro was licensed as an advanced practice registered nurse in Florida on or about August 9, 2023, and owned and controlled Tampa Bay Medical.

10.   Defendant Luis Miranda-Genaro, M.D. ("Miranda-Genaro") resides in and is a citizen of Florida. Miranda-Genaro was licensed to practice medicine in Florida on or about December 11, 1989. Miranda-Genaro falsely purported to serve as the medical director at Tampa Bay Medical between April 2003 and mid-2024, falsely purported to serve as the medical director at Sunsky between May 2021 and July 2024, and falsely purported to perform or directly supervise many of the Fraudulent Services at Sunsky and Tampa Bay Medical. Upon information and belief based on publicly available information, Miranda-Genero currently is 89 years old, and was in his mid-to-late 80s throughout the period when the events giving rise to this action occurred.

11.   Defendant Ellena Lois Boddie, M.D. ("Boddie") resides in and is a citizen of Florida. Boddie was licensed to practice medicine in Florida on or about

August 12, 2020. Boddie falsely purported to serve as the medical director at Tampa Bay Medical between mid-2024 and the present.

12.     Defendant Sunsky is a Florida corporation with its principal place of business in Tampa, Florida. Sunsky was incorporated in Florida on or about January 29, 2016, was owned and controlled by Jose V. Pujols ("Pujols"), and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

13.     Defendant Jose V. Pujols ("Pujols") resides in and is a citizen of Florida. At all relevant times, Pujols owned and controlled Sunsky.

14.     Defendant Luis August Logrono, M.D. ("Logrono") resides in and is a citizen of Florida. Logrono was licensed to practice medicine in Florida on or about December 12, 1994, falsely purported to serve as the medical director at Sunsky between July 2024 and the present, and falsely purported to perform or directly supervise many of the Fraudulent Services at Sunsky.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interests and costs, exceeds the jurisdictional threshold of $75,000.00, and the action is between citizens of different states.

16.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

17.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Middle District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of this Complaint occurred.

## ALLEGATIONS

### I.     Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

19.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to insureds.

20.     Under the No-Fault Law, an insured can assign their right to PIP Benefits to health care services providers in exchange for those services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company using the required claim forms – including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500" form) – in order to receive payment for medically necessary services.

21.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, a health care services provider, including a clinic licensed under the Clinic Act, is only eligible to receive PIP Benefits for medically necessary services.

22.    Pursuant to the No-Fault Law, "medically necessary" means:

[A] medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)    In accordance with generally accepted standards of medical practice;

(b)    Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c)    Not primarily for the convenience of the patient, physician, or other health care provider.

23.    PIP reimbursement for health care services is normally limited to $2,500.00 per insured. However, if a physician, physician assistant, advanced practice registered nurse, or dentist determines that an injured person suffered from an "emergency medical condition", health care providers can be reimbursed up to $10,000.00 per insured for health care services. Pursuant to the No-Fault Law, other types of health care practitioners – such as chiropractors – may not issue "emergency medical condition" diagnoses to patients so as to increase the potential PIP reimbursement from $2,500.00 to $10,000.00 per insured.

24.    Pursuant to the No-Fault Law, an "emergency medical condition" means: "a medical condition manifesting itself by acute symptoms of sufficient severity, which may include severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) [s]erious jeopardy to patient health[;] (b) [s]erious impairment to bodily functions[; and/or] (c) [s]erious dysfunction of any bodily organ or part."

25.    In order for a health care service to be eligible for PIP reimbursement, it not only must be medically necessary, but also must be "lawfully" provided.

26.    Pursuant to the No-Fault Law, "lawful" or "lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

27.    Thus, health care services providers, including clinics licensed under the Clinic Act, may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

28.    Pursuant to the Clinic Act, and subject to certain limited exceptions that are not applicable in this case, a license issued by the Florida Agency for Health Care Administration (the "AHCA") is required in order to operate a clinic in Florida. The Clinic Act defines "clinic" to mean "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

29.    Pursuant to the Clinic Act, health care clinics must – among other things – appoint a licensed physician as medical director who must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful," and take immediate corrective action upon discovery of a fraudulent or unlawful charge. Additionally, a clinic medical director must "[e]nsure that all health care practitioners

8

at the clinic have active appropriate certification or licensure for the level of care being provided."

30.     Further, pursuant to the Clinic Act, a clinic medical director must "[s]erve as the clinic records owner as defined in [Fla. Stat. §] 456.057." Pursuant to Fla. Stat. § 456.057(10), "[a]ll records owners shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record," and all "[e]mployees of records owners shall be trained in these policies, standards, and procedures."

31.     Pursuant to the Clinic Act, no health care clinic in Florida may operate without the day-to-day supervision of a legitimate physician-medical director.

32.     Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed . . . but that is not so licensed, or that is otherwise operating in violation of this part . . . is an unlawful charge" and is ineligible for payment. Moreover, "[a] person who knowingly makes . . . an unlawful charge commits theft within the meaning of, and [which is] punishable as provided in, [Fla. Stat. §] 812.014."

33.     Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

34.     Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving – or

failing to make a good-faith effort to collect – co-payments or deductibles from patients with PIP insurance.

35.     Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

36.     Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics operating pursuant to the Clinic Act, to collect PIP Benefits for massage therapy or for services performed by massage therapists, so long as – among other things – the massage therapy was "provided, supervised, ordered, or prescribed by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting."

37.     However, the No-Fault Law was amended, effective January 1, 2013, to prohibit reimbursement for massage or for services rendered by massage therapists, regardless of any other kinds of health care licenses the massage therapists may have, and regardless of whether the massage therapists work under the supervision of other licensed health care practitioners.

38.     Pursuant to the Physical Therapy Act, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

39.     The Physical Therapy Act also prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an

10

exception to this rule, which permits a physical therapist to delegate certain patient care activities to an unlicensed assistant, this exception only applies if the unlicensed assistant works under the direct supervision of a physical therapist.

40.    Health care practices operating in Florida may not collect PIP Benefits for: (i) massage; (ii) any services performed by massage therapists; or (iii) physical therapy services that are performed by unlicensed individuals without direct supervision by a licensed physical therapist. Thus, any such charges submitted by a health care provider are unlawful and noncompensable.

41.    Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)    for any service or treatment that is "upcoded", meaning that the service or treatment is billed using a billing code that would result in payment greater in amount than would be paid by using a billing code that accurately describes the services or treatments performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)    with respect to a bill or statement that does not substantially meet the billing requirements as set forth in the No-Fault Law.

42.    The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare and Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes that are used to bill for health care services.

11

43.     In turn, the instructions promulgated by CMS for the completion of HCFA-1500 forms require – among other things – that all HCFA-1500 forms set forth – in Box 31 – the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

44.     To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

45.     Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials".

46.     Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

## II.     The Defendants' Interrelated Fraudulent and Unlawful Schemes

47.     Since at least 2019, and continuing through the present day, the Defendants devised and implemented interrelated fraudulent and unlawful schemes in which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

12

48.     In the claims identified in Exhibits "1" – "2", almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as the result of the relatively minor accidents they experienced.

49.     Even so, in the claims identified in Exhibits "1" – "2", the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined fraudulent protocols designed to maximize the billing that they could submit to insurers, including GEICO, rather than to provide medically necessary treatment to the Insureds.

50.     The Defendants purported to provide their pre-determined fraudulent treatment protocol to the Insureds in the claims identified in Exhibits "1" – "2" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the absence of any significant continuing medical problems arising from any automobile accidents.

51.     Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

52.     No legitimate physicians, health care practitioners, or clinics would permit the fraudulent and unlawful treatment and billing protocols described herein to proceed under their auspices.

53.     The Defendants permitted the fraudulent and unlawful treatment and billing protocols described below to proceed under their auspices because they sought

to profit from the fraudulent billing they submitted to GEICO and other insurers.

## 1. The Fraudulent Charges for Initial Examinations at Tampa Bay Medical and Sunsky

54.    As an initial step in the Defendants' fraudulent treatment and billing protocols, the Defendants purported to provide most of the Insureds in the claims identified in Exhibits "1" – "2" with an initial examination, with Miranda-Genaro purporting to personally perform or directly supervise most of the initial examinations.

55.    The purported initial examinations then were billed to GEICO in the following manner:

    (i)    in the claims identified in Exhibit "1", Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie billed GEICO under CPT code 99204 for each initial examination that they purported to provide; and

    (ii)    in the claims identified in Exhibit "2", Sunsky, Pujols, Miranda-Genaro, and Logrono billed GEICO under CPT code 99204 for each initial examination that they purported to provide.

56.    In the claims for initial examinations identified in Exhibit "1" – "2", the Defendants falsely represented that they were entitled to recover PIP Benefits in the first instance, when in fact they were not because they operated in violation of Florida law, as set forth herein.

57.    In the claims for initial examinations in Exhibits "1" – "2", the Defendants also misrepresented the nature, extent, and the results of the initial examinations.

## (i) Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

58.    As set forth herein, the No-Fault Law's billing requirements provide that

all PIP billing must – among other things – comply with the guidelines promulgated by the AMA in connection with the use of CPT codes.

59.     The primary guidelines promulgated by the AMA for the use of CPT codes are contained in the AMA's CPT Assistant.

60.     Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial examination typically represents that the patient presented with problems of moderate to high severity.

61.     The CPT Assistant provides the following clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

62.     Accordingly, pursuant to the CPT Assistant, the moderate to high

15

severity presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

63.    However, to the extent that the Insureds in the claims identified in Exhibits "1" – "2" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems almost always were minimal severity soft tissue injuries such as sprains and strains.

64.    For instance, in many of the claims identified in Exhibits "1" – "2", the Insureds did not seek treatment at any hospital as the result of their accident, and to the limited extent that the Insureds in the claims identified in Exhibits "1" – "2" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis and then discharged with nothing more serious than a minor soft tissue diagnosis.

65.    Furthermore, in most of the claims identified in Exhibits "1" – "2", contemporaneous police reports indicated that the Insureds' vehicles were functional following the accidents, and that no one was seriously injured in their accidents, or injured at all.

66.    Even so, in the claims for initial examinations identified in Exhibits "1" – "2", the Defendants billed for the putative initial examinations using CPT code 99204, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

67.    For example:

(i)     On October 3, 2020, an Insured named EZ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that EZ's vehicle was drivable following the accident. The police report further indicated that EZ was not injured and did not complain of any pain at the scene. In keeping with the fact that EZ was not seriously injured, EZ did not visit any hospital emergency room following the accident. To the extent that EZ experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of EZ by Miranda-Genaro on October 5, 2020, Sunsky, Pujols, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)     On December 13, 2020, an Insured named FM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that FM's vehicle was drivable following the accident. The police report further indicated that FM was not injured and did not complain of any pain at the scene. In keeping with the fact that FM was not seriously injured, FM did not visit any hospital emergency room following the accident. To the extent that FM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of FM by Miranda-Genaro on December 21, 2020, Tampa Bay Medical, Amaro, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)     On May 15, 2021, an Insured named KC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that KC's vehicle was drivable following the accident. The police report further indicated that KC was not injured and did not complain of any pain at the scene. In keeping with the fact that KC was not seriously injured, KC did not visit any hospital emergency room following the accident. To the extent that KC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of KC by Miranda-Genaro on May 27, 2021, Sunsky, Pujols, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)      On December 18, 2021, an Insured named LV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LV's vehicle was drivable following the accident. The police report further indicated that LV was not injured and did not complain of any pain at the scene. In keeping with the fact that LV was not seriously injured, LV did not visit any hospital emergency room following the accident. To the extent that LV experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of LV by Miranda-Genaro on December 20, 2021, Sunsky, Pujols, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)      On February 1, 2022, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured and did not complain of any pain at the scene. In keeping with the fact that MD was not seriously injured, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MD by Miranda-Genaro on February 7, 2022, Tampa Bay Medical, Amaro, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)      On April 6, 2022, an Insured named CG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that CG's vehicle was drivable following the accident. The police report further indicated that CG was not injured and did not complain of any pain at the scene. In keeping with the fact that CG was not seriously injured, CG did not visit any hospital emergency room following the accident. To the extent that CG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of CG by Miranda-Genaro on April 11, 2022, Tampa Bay Medical, Amaro, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)   On October 28, 2022, an Insured named SB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SB's vehicle was drivable following the accident. The police report further indicated that SB was not injured and did not complain of any pain at the scene. In keeping with the fact that SB was not seriously injured, SB did not visit any hospital emergency room following the accident. To the extent that SB experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of SB by Miranda-Genaro on November 2, 2022, Sunsky, Pujols, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)  On January 15, 2023, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AR by Miranda-Genaro on January 19, 2023, Tampa Bay Medical, Amaro, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ix)    On March 27, 2023, an Insured named SR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that SR's vehicle was drivable following the accident. The police report further indicated that SR was not injured and did not complain of any pain at the scene. In keeping with the fact that SR was not seriously injured, SR did not visit any hospital emergency room following the accident. To the extent that SR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of SR by Miranda-Genaro on March 28, 2023, Tampa Bay Medical, Amaro, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high

severity.

(x)    On April 24, 2023, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured and did not complain of any pain at the scene. In keeping with the fact that AC was not seriously injured, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AC by Miranda-Genaro on April 26, 2023, Tampa Bay Medical, Amaro, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xi)   On October 25, 2023, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of AM by Miranda-Genaro on November 3, 2023, Sunsky, Pujols, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xii)  On March 27, 2024, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of LP by Amaro on April 2, 2024, Tampa Bay Medical, Amaro, and Boddie billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination

20

involved presenting problems of moderate to high severity.

(xiii)   On July 15, 2024, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain at the scene. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of MP by Amaro on July 25, 2024, Tampa Bay Medical, Amaro, and Boddie billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiv)   On November 7, 2024, an Insured named LY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LY's vehicle was drivable following the accident. The police report further indicated that LY was not injured and did not complain of any pain at the scene. In keeping with the fact that LY was not seriously injured, LY did not visit any hospital emergency room following the accident. To the extent that LY experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of LY by Logrono on November 8, 2024, Sunsky, Pujols, and Logrono billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv)   On December 5, 2024, an Insured named RP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RP's vehicle was drivable following the accident. The police report further indicated that RP was not injured and did not complain of any pain at the scene. In keeping with the fact that RP was not seriously injured, RP did not visit any hospital emergency room following the accident. To the extent that RP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination of RP by Logrono on December 9, 2024, Sunsky, Pujols, and Logrono billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

68.    These are only representative examples. In the claims for initial examinations identified in Exhibits "1" – "2", the Defendants routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Amount of Time Spent on the Purported Initial Examinations**

69.    What is more, in the claims identified in Exhibits "1" – "2", the charges for the initial examinations under CPT code 99204 misrepresented and exaggerated the amount of time that the examining health care practitioner spent providing the examinations.

70.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the physician or other health care practitioner who performed the underlying examination spent at least 45 minutes of time performing the examination.

71.    As set forth in Exhibits "1" – "2", the Defendants typically billed the purported initial examinations to GEICO through Tampa Bay Medical and Sunsky under CPT code 99204, and thereby represented that the practitioners who purported to conduct the examinations – usually Miranda-Genaro – spent at least 45 minutes of

time performing the examinations.

72.    In fact, in the initial examinations identified in Exhibits "1" – "2", the practitioners who purported to perform the initial examinations on behalf of Tampa Bay Medical and Sunsky never spent more than 15-20 minutes when conducting the examinations, much less 45 minutes.

73.    For instance, and in keeping with the fact that the initial examinations purportedly provided through Tampa Bay Medical and Sunsky did not take more than 15-20 minutes of time to perform, the examining practitioners used template forms in purporting to conduct the initial examinations.

74.    All that was required to complete the template forms was a brief patient interview and a perfunctory physical examination of the Insureds, using a limited range of examination parameters.

75.    These brief interviews and examinations did not require Miranda-Genaro, or any other examining health care practitioner associated with Tampa Bay Medical and Sunsky, to spend more than 15-20 minutes performing the putative initial examinations.

76.    Moreover, the purported initial examinations in the claims identified in Exhibits "1" – "2" were not legitimately performed at all, inasmuch as the outcomes of the putative examinations were pre-determined to result in false, soft tissue injury diagnoses and medically unnecessary treatment recommendations, regardless of the Insureds' actual individual circumstances and presentation. These false and predetermined examinations did not require the examining practitioners to spend

23

more than 15-20 minutes performing the putative initial examinations.

77.    In the claims for initial examinations that are identified in Exhibits "1" – "2", the Defendants routinely misrepresented the amount of time that was spent in conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that take less time to perform.

**(iii)    Misrepresentations Regarding the Extent of Medical Decision-Making During the Purported Initial Examinations**

78.    Pursuant to the CPT Assistant, there are four potential levels of medical decision-making in which a health care practitioner can engage in connection with an initial patient examination, namely straightforward, low complexity, moderate complexity, and high complexity medical decision-making.

79.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

80.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represents that the physician or health care practitioner who performed the examination engaged in legitimate, "moderate complexity"

24

medical decision-making in connection with the examination.

81.    For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must – among other things – involve: (i) chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) review and analysis of a significant amount of the patient's medical records and history; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

82.    As set forth above and in Exhibits "1" – "2", the Defendants billed GEICO for most of their putative initial patient examinations using CPT code 99204, and thereby falsely represented that the practitioners who purported to perform the examinations on behalf of Tampa Bay Medical and Sunsky – usually Miranda-Genaro – engaged in genuine moderate complexity medical decision-making in connection with the initial examinations.

83.    In actuality, the purported initial examinations did not involve any legitimate medical decision-making at all.

84.    Rather, in the claims for initial examinations identified in Exhibits "1" – "2": (i) the initial examinations did not involve the retrieval, review, or analysis of any meaningful amount of medical records, diagnostic tests, or other information; (ii) there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any

complaints arising from automobile accidents at all; and (iii) the Defendants and the healthcare practitioners at Tampa Bay Medical and Sunsky who worked at the Defendants' direction did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations, and instead provided a substantially similar, pre-determined sprain/strain or similar soft tissue injury "diagnoses" for virtually every Insured, regardless of their true individual circumstances or presentation.

85.    For example:

(i)    On December 13, 2020, an Insured named FM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that FM's vehicle was drivable following the accident. The police report further indicated that FM was not injured and did not complain of any pain at the scene. In keeping with the fact that FM was not seriously injured, FM did not visit any hospital emergency room following the accident. To the extent that FM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on December 21, 2020, Miranda-Genaro purported to conduct an initial examination of FM at Tampa Bay Medical. To the extent that Miranda-Genaro performed the examination in the first instance, Miranda-Genaro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Miranda-Genaro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Miranda-Genaro provided FM with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither FM's presenting problems, nor the treatment plan provided to FM by Tampa Bay Medical, Amaro, and Miranda-Genaro presented any risk of significant complications, morbidity, or mortality. To the contrary, FM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Medical, Miranda-Genaro, and Amaro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to FM. Even so, Tampa Bay Medical, Amaro, and Miranda-Genaro billed GEICO for the initial examination using

CPT code 99204, and thereby falsely represented that Miranda-Genaro engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii) On February 1, 2022, an Insured named MD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MD's vehicle was drivable following the accident. The police report further indicated that MD was not injured and did not complain of any pain at the scene. In keeping with the fact that MD was not seriously injured, MD did not visit any hospital emergency room following the accident. To the extent that MD experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on February 7, 2022, Miranda-Genaro purported to conduct an initial examination of MD at Tampa Bay Medical. To the extent that Miranda-Genaro performed the examination in the first instance, Miranda-Genaro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Miranda-Genaro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Miranda-Genaro provided MD with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither MD's presenting problems, nor the treatment plan provided to MD by Tampa Bay Medical, Amaro, and Miranda-Genaro presented any risk of significant complications, morbidity, or mortality. To the contrary, MD did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Medical, Amaro, and Miranda-Genaro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MD. Even so, Tampa Bay Medical, Amaro, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Miranda-Genaro engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii) On March 7, 2022, an Insured named MT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MT's vehicle was drivable following the accident. The police report further indicated that MT was not injured and did not complain of any pain at the scene. In keeping with the fact that MT was not seriously injured, MT did not visit any hospital emergency room following the accident. To the extent that MT experienced any health problems at all as a result of the accident, they

27

were of minimal severity. Even so, on March 9, 2022, Miranda-Genaro purported to conduct an initial examination of MT at Sunsky. To the extent that Miranda-Genaro performed the examination in the first instance, Miranda-Genaro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Miranda-Genaro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Miranda-Genaro provided MT with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither MT's presenting problems, nor the treatment plan provided to MT by Sunsky, Pujols, and Miranda-Genaro, presented any risk of significant complications, morbidity, or mortality. To the contrary, MT did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sunsky, Pujols, and Miranda-Genaro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MT. Even so, Sunsky, Pujols, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Miranda-Genaro engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)   On January 15, 2023, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, AR did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on January 19, 2023, Miranda-Genaro purported to conduct an initial examination of AR at Tampa Bay Medical. To the extent that Miranda-Genaro performed the examination in the first instance, Miranda-Genaro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Miranda-Genaro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Miranda-Genaro provided AR with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AR's presenting problems, nor the treatment plan provided to AR by Tampa Bay Medical, Amaro, and Miranda-Genaro presented any risk of significant complications,

28

morbidity, or mortality. To the contrary, AR did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Medical, Amaro, and Miranda-Genaro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AR. Even so, Tampa Bay Medical, Amaro, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Miranda-Genaro engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)     On January 27, 2023, an Insured named AC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AC's vehicle was drivable following the accident. The police report further indicated that AC was not injured and did not complain of any pain at the scene. In keeping with the fact that AC was not seriously injured, AC did not visit any hospital emergency room following the accident. To the extent that AC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on February 6, 2023, Miranda-Genaro purported to conduct an initial examination of AC at Sunsky. To the extent that Miranda-Genaro performed the examination in the first instance, Miranda-Genaro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Miranda-Genaro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Miranda-Genaro provided AC with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AC's presenting problems, nor the treatment plan provided to AC by Sunsky, Pujols, and Miranda-Genaro, presented any risk of significant complications, morbidity, or mortality. To the contrary, AC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sunsky, Pujols, and Miranda-Genaro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AC. Even so, Sunsky, Pujols, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Miranda-Genaro engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)    On October 25, 2023, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that AM's vehicle was

drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on November 3, 2023, Miranda-Genaro purported to conduct an initial examination of AM at Sunsky. To the extent that Miranda-Genaro performed the examination in the first instance, Miranda-Genaro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Miranda-Genaro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Miranda-Genaro provided AM with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Sunsky, Pujols, and Miranda-Genaro presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sunsky, Pujols, and Miranda-Genaro consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to AM. Even so, Sunsky, Pujols, and Miranda-Genaro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Miranda-Genaro engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)   On March 27, 2024, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LP's vehicle was drivable following the accident. The police report further indicated that LP was not injured and did not complain of any pain at the scene. In keeping with the fact that LP was not seriously injured, LP did not visit any hospital emergency room following the accident. To the extent that LP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on April 2, 2024, Amaro purported to conduct an initial examination of LP at Tampa Bay Medical. To the extent that Amaro performed the examination in the first instance, Amaro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Amaro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Amaro provided LP with substantially the same

false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither LP's presenting problems, nor the treatment plan provided to LP by Tampa Bay Medical, Amaro, and Boddie presented any risk of significant complications, morbidity, or mortality. To the contrary, LP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Medical, Amaro, and Boddie consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LP. Even so, Tampa Bay Medical, Amaro, and Boddie billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amaro engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)   On July 15, 2024, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured and did not complain of any pain at the scene. In keeping with the fact that MP was not seriously injured, MP did not visit any hospital emergency room following the accident. To the extent that MP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on July 25, 2024, Amaro purported to conduct an initial examination of MP at Tampa Bay Medical. To the extent that Amaro performed the examination in the first instance, Amaro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Amaro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Amaro provided MP with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to other Insureds. Furthermore, neither MP's presenting problems, nor the treatment plan provided to MP by Tampa Bay Care, Amaro, and Boddie presented any risk of significant complications, morbidity, or mortality. To the contrary, MP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Tampa Bay Medical, Amaro, and Boddie consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to MP. Even so, Tampa Bay Medical, Amaro, and Boddie billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Amaro engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)    On November 7, 2024, an Insured named LP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that LY's vehicle was drivable following the accident. The police report further indicated that LY was not injured and did not complain of any pain at the scene. In keeping with the fact that LY was not seriously injured, LY did not visit any hospital emergency room following the accident. To the extent that LY experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on November 8, 2024, Logrono purported to conduct an initial examination of LY at Sunsky. To the extent that Logrono performed the examination in the first instance, Logrono did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Logrono did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Logrono provided LY with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither LY's presenting problems, nor the treatment plan provided to LY by Sunsky, Pujols, and Logrono presented any risk of significant complications, morbidity, or mortality. To the contrary, LY did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sunsky, Pujols, and Logrono consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to LY. Even so, Sunsky, Pujols, and Logrono billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Logrono engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)    On December 5, 2024, an Insured named RP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact collision and that RP's vehicle was drivable following the accident. The police report further indicated that RP was not injured and did not complain of any pain at the scene. In keeping with the fact that RP was not seriously injured, RP did not visit any hospital emergency room following the accident. To the extent that RP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on December 9, 2024, Logrono purported to conduct an initial examination of RP at Sunsky. To the extent that Logrono performed the examination in the first instance, Logrono did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with

the examination. Moreover, Logrono did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Logrono provided RP with substantially the same false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to other Insureds. Furthermore, neither RP's presenting problems, nor the treatment plan provided to RP by Sunsky, Pujols, and Logrono presented any risk of significant complications, morbidity, or mortality. To the contrary, RP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Sunsky, Pujols, and Logrono consisted of medically unnecessary physical therapy services, which did not pose the least bit of risk to RP. Even so, Sunsky, Pujols, and Logrono billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Logrono engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

86.    These are only representative examples. In the claims identified in Exhibits "1" – "2", the Defendants routinely falsely represented that the purported examinations involved legitimate moderate complexity decision-making, when, in fact, they did not involve any legitimate medical decision-making at all.

87.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

88.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

89.    As set forth herein, in the claims identified in Exhibits "1" – "2", the Insureds whom the Defendants purported to treat were involved in relatively minor accidents.

90.    It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "2" would suffer

substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

91.    It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "2" would present for an initial examination with substantially identical symptoms, and receive substantially identical diagnoses, on or about the exact same date after their underlying automobile accident.

92.    It is even more improbable – to the point of impossibility – that this would occur with great frequency within a cohort of patients treating at individual clinics such as Tampa Bay Medical and Sunsky.

93.    Even so, in keeping with the fact that the Defendants' putative "diagnoses" were false, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, the Defendants – and their associates working under their direction – frequently issued substantially similar, false "diagnoses", on or around the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

94.    For example:

(i)    On February 12, 2020, two Insureds – LE and AM – were involved in the same automobile accident. Thereafter, both Insureds presented at Sunsky for initial examinations on the exact same date, February 13, 2020. LE and AM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact

from different positions in the vehicle. To the extent that LE and AM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Sunsky, Pujols, and Miranda-Genaro caused LE and AM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ii)    On October 23, 2020, three Insureds – HS, IC, and HC – were involved in the same automobile accident. Thereafter, all three Insureds presented at Tampa Bay Medical for initial examinations on the exact same date, October 28, 2020. HS, IC, and HC were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that HS, IC, and HC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Medical, Amaro, and Miranda-Genaro caused HS, IC, and HC to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iii)    On January 17, 2021, two Insureds – MR and TM – were involved in the same automobile accident. Thereafter, both Insureds presented at Sunsky for initial examinations by Miranda-Genaro on the exact same date, January 30, 2021. MR and TM were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that MR and TM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Sunsky, Pujols, and Miranda-Genaro caused MR and TM to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(iv)    On July 2, 2021, two Insureds – AB and SH – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Medical for initial examinations on the exact same date, July 13, 2021. AB and SH were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that AB and SH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Medical, Amaro, and Miranda-Genaro caused AB and SH to be

provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(v)   On December 20, 2021, two Insureds – JF and AC – were involved in the same automobile accident. Thereafter, both Insureds presented at Sunsky for initial examinations on the exact same date, December 29, 2021. JF and AC were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JF and AC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Sunsky, Pujols, and Miranda-Genaro caused JF and AC to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vi)   On May 18, 2022, three Insureds – EO, SJ, and DL – were involved in the same automobile accident. Thereafter, all three Insureds presented at Tampa Bay Medical for initial examinations on the exact same date, May 27, 2022. EO, SJ, and DL were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that EO, SJ, and DL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Medical, Amaro, and Miranda-Genaro caused EO, SJ, and DL to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(vii)   On November 26, 2022, two Insureds – GC and LC – were involved in the same automobile accident. Thereafter, both Insureds presented at Tampa Bay Medical for initial examinations on the exact same date, November 29, 2022. GC and LC were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that GC and LC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Medical, Amaro, and Miranda-Genaro caused GC and LC to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(viii)    On March 1, 2023, three Insureds – JR, EZ, and CE – were involved in the same automobile accident. Thereafter, all three Insureds presented at Sunsky for initial examinations on the exact same date, March 2, 2023. JR, EZ, and CE were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that JR, EZ, and CE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Sunsky, Pujols, and Miranda-Genaro caused JR, EZ, and CE to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(ix)    On March 30, 2024, two Insureds – LC and MC – were involved in the same automobile accident. Thereafter, both Insureds presented at Sunsky for initial examinations on the exact same date, April 1, 2024. LC and MC were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that LC and MC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Sunsky, Pujols, and Miranda-Genaro caused LC and MC to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

(x)    On March 19, 2025, three Insureds – YC, DC, and DC – were involved in the same automobile accident. Thereafter, all three Insureds presented at Tampa Bay Medical for initial examinations on the exact same date, March 28, 2025. YC, DC, and DC were different ages, in different physical condition, located in different positions in the vehicle, and experienced the impact from different positions in the vehicle. To the extent that YC, DC, and DC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the purported initial examinations, Tampa Bay Medical, Amaro, and Miranda-Genaro caused YC, DC, and DC to be provided with false, substantially similar soft tissue injury "diagnoses", and to be recommended a substantially similar course of medically unnecessary treatment.

95.    These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" – "2", the Defendants frequently

issued substantially similar "diagnoses" – on or about the same date – to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that each of the Insureds was differently situated and, in any case, did not require the treatment.

96.    The Defendants routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

97.    In the claims for initial examinations identified in Exhibits "1" – "2", the Defendants routinely falsely represented that the initial examinations involved medical decision-making of moderate complexity in order to provide a false basis to bill for the initial examinations under CPT code 99204, because CPT code 99204 is reimbursable at higher rates than examinations that do not require any complex medical decision-making at all.

98.    In actuality, the initial examinations did not involve any legitimate medical decision-making at all, because the purported "results" of the examinations were pre-determined and falsified, and designed to provide a false justification for the laundry list of other Fraudulent Services that the Defendants purported to provide.

99.    In the claims for initial examinations identified in Exhibits "1" – "2", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when, in fact, they were neither lawfully

provided nor reimbursable, because:

(i)     the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii)    the charges for putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii)   neither Sunsky nor Tampa Bay Medical were ever eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinics were unlawfully operated in violation of Florida Law.

## 2. The Defendants' Fraudulent Charges for Follow-Up Examinations

100.   In addition to the fraudulent initial examinations, the Defendants often purported to subject the Insureds in the claims in Exhibits "1" – "2" to one or more fraudulent follow-up examination(s) during the course of their fraudulent treatment and billing protocol.

101.   The purported follow-up examinations then typically were billed to GEICO in the following manner:

(i)     in the claims identified in Exhibit "1", Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie typically billed GEICO under CPT code 99214 for the follow-up examinations that they purported to provide; and

(ii)    in the claims identified in Exhibit "2", Sunsky, Pujols, Miranda-Genaro, and Logrono typically billed GEICO under CPT codes 99213 and 99214 for the follow-up examinations that they purported to provide.

102.   As set forth herein, the charges for the follow-up examinations identified in Exhibits "1" – "2" misrepresented the nature, extent, and results of the follow-up examinations, and falsely represented that Tampa Bay Medical and Sunsky were

operating in accordance with Florida law and were eligible to receive PIP reimbursement in the first place.

**(i)   Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

103.   Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically represents – among other things – that the patient presented with problems of low to moderate severity at the time of the examination.

104.   The CPT Assistant provides various clinical examples of low to moderate severity presenting problems that would support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)   Follow-up visit with a 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)   Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)   Routine, follow-up office evaluation at three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)   Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)   Quarterly follow-up visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

105.     Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some ongoing, real threat to the patient's health.

106.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up patient examination typically represents that the insured presented with problems of moderate to high severity.

107.     The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)      Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)     Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)     Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)      Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)     Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology / General Surgery / Internal Medicine / Family Medicine)

(viii)    Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

108.    Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

109.    By contrast, and as set forth herein, to the extent that the Insureds in the claims identified in Exhibits "1" – "2" suffered any injuries at all in their automobile accidents, the injuries almost always were minor soft tissue injuries such as sprains and strains, which were of minimal severity, even at their onset.

110.    Minor soft tissue injuries such as strains and sprains almost always resolve after a short course of conservative treatment or no treatment at all.

111.    By the time the Insureds in the claims identified in Exhibits "1" – "2" presented at Tampa Bay Medical and Sunsky for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their typically minor automobile accidents, or their problems were minimal.

112.    Even so, in the claims for the follow-up examinations identified in Exhibits "1" – "2", the Defendants made the following misrepresentations:

(i)    When billing for putative follow-up examinations using CPT code 99213

42

in the claims identified in Exhibit "2", Sunsky, Pujols, Miranda-Genaro, and Logrono falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the purported follow-up examinations.

(ii)    When billing GEICO for putative follow-up examinations using CPT code 99214 in the claims identified in Exhibit "1" – "2", the Defendants represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the purported follow-up examinations..

113.    In the claims for follow-up examinations under CPT codes 99213 and 99214 that are identified in Exhibits "1" – "2", the Defendants routinely falsely represented that the Insureds presented with problems of either low to moderate severity or moderate to high severity in order to: (i) create a false basis for their charges for their charges for the examinations under CPT codes 99213 and 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**(ii)    Misrepresentations Regarding the Nature, Extent, and Results of the Follow-Up Examinations**

114.    What is more, in the claims for follow-up examinations identified in Exhibits "1" – "2", neither Miranda-Genaro, nor any other physician or health care practitioner at Tampa Bay Medical and Sunsky working at the Defendants' direction, ever took any legitimate patient histories, conducted any legitimate physical

examinations, or engaged in any legitimate medical decision-making at all.

115.    Rather, Miranda-Genaro, and other health care practitioners working at the Defendants' direction at Tampa Bay Medical and Sunsky – simply: (i) reiterated the false, boilerplate, "diagnoses" from the Insureds' initial examinations; and either (ii) referred the Insureds for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

116.    The putative "follow-up examinations" that the Defendants purported to provide to the Insureds in the claims identified in Exhibits "1" – "2" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the supposed "results" of the examinations were prearranged to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into Tampa Bay Medical and Sunsky's offices.

117.    In the claims for follow-up examinations identified in Exhibits "1" – "2", the Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because:

(i)    the putative examinations were illusory, with outcomes that were pre-determined to result in substantially identical, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual

circumstances and presentation;

(ii)     the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii)    Tampa Bay Medical and Sunsky were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as the clinics were unlawfully operated in violation of Florida law.

**3.     The Defendants' Fraudulent and Unlawful Charges for "Physical Therapy" Services**

118.    In addition to the fraudulent and unlawful initial examinations and follow-up examinations, the Defendants typically purported to subject each of the Insureds in the claims identified in Exhibits "1" – "2" to months of medically unnecessary physical therapy treatment.

119.    In the claims identified in Exhibit "1", Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie typically billed the purported physical therapy services to GEICO under:

(i)      CPT code 97010 for putative hot/cold packs, typically resulting in a charge of $55.00 for each round of hot/cold packs they purported to provide;

(ii)     CPT code 97012 for putative mechanical traction, typically resulting in a charge of $35.00 for each round of mechanical traction they purported to provide;

(iii)    CPT code 97032 for putative electrical stimulation, typically resulting in a charge of $40.00 for each round of electrical stimulation they purported to provide;

(iv)     CPT code 97033 for putative iontophoresis, typically resulting in a charge of $70.00 for each round of iontophoresis they purported to provide;

(v)      CPT code 97034 for putative contrast bath therapy, typically resulting in

45

a charge of $45.00 for each round of contrast bath therapy they purported to provide;

(vi)    CPT code 97035 for putative ultrasound therapy, typically resulting in a charge of $30.00 for each round of ultrasound therapy they purported to provide;

(vii)   CPT code 97112 for putative neuromuscular reeducation, typically resulting in a charge of $70.00 for each round of neuromuscular reeducation they purported to provide; and

(viii)  CPT code 97140 for putative manual therapy, typically resulting in a charge of $65.00 for each round of manual therapy they purported to provide.

120.   In the claims identified in Exhibit "2", Sunsky, Pujols, Miranda-Genaro,

and Logrono typically billed the purported physical therapy services to GEICO under:

(i)    CPT code 97010 for putative hot/cold packs, typically resulting in a charge of $20.00 for each round of hot/cold packs they purported to provide;

(ii)   CPT code 97014 for putative electrical stimulation, typically resulting in a charge of $30.00 for each round of electrical stimulation they purported to provide;

(iii)  CPT code 97026 for putative infrared light therapy, typically resulting in a charge of $20.00 for each round of infrared light therapy they purported to provide;

(iv)   CPT code 97035 for putative ultrasound therapy, typically resulting in a charge of $25.00 to $29.00 for each round of ultrasound therapy they purported to provide;

(v)    CPT code 97110 for putative therapeutic exercises, typically resulting in a charge of $63.30 for each round of therapeutic exercises they purported to provide; and

(vi)   CPT code 97140 for putative manual therapy, typically resulting in a charge of $59.30 for each round of manual therapy they purported to provide.

121.   In the claims for purported physical therapy services identified in Exhibits "1" – "2', the charges for the physical therapy services were fraudulent in that they misrepresented the Defendants' eligibility to collect PIP Benefits in the first instance.

122.   In fact, and as set forth herein, the Defendants never were eligible to collect PIP Benefits, because of their fraudulent and unlawful activities.

123.   What is more, in a legitimate clinical setting, the individual physical therapy services that are provided to an individual patient should be tailored to that patient's individual circumstances and presentation.

124.   In keeping with the fact that the purported physical therapy services that were billed through Tampa Bay Medical and Sunsky to GEICO were not medically necessary, the Defendants did not tailor the physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

125.   There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs.

126.   However, the Defendants routinely purported to provide the same handful of physical therapy "treatments" to the Insureds in the claims identified in Exhibits "1" – "2", without regard for the Insureds' individual circumstances.

127.   Moreover, in the claims for "physical therapy" services identified in Exhibit "1", the services unlawfully were performed – to the extent that they were performed at all – by unlicensed and unsupervised individuals, including Amaro prior

to her licensure as an advanced practice registered nurse in 2023, and by an individual named Dailin Oquendo.

128.    In the claims for "physical therapy" services identified in Exhibit "2", the services unlawfully were performed – to the extent that they were performed at all – by unlicensed and unsupervised individuals, and by massage therapists, including individuals named Marlaria Sanchez, L.M.T. and Rafael Frias, L.M.T.

129.    The Defendants were aware of the fact that they could not lawfully recover PIP Benefits for physical therapy services performed by massage therapists or unsupervised/unlicensed individuals.

130.    As a result, and in order to conceal the fact that Sanchez, Frias, and other massage therapists and unsupervised/unlicensed individuals performed the purported physical therapy services that were unlawfully billed through Tampa Bay Medical and Sunsky to GEICO, the Defendants deliberately omitted any reference to Frias, Sanchez, and other massage therapists and unlicensed/unsupervised individuals associated with Tampa Bay Medical and Sunsky on the HCFA-1500 forms that they used to bill for the putative physical therapy services.

131.    Instead, in the claims for physical therapy services identified in Exhibits "1" – "2", the Defendants routinely falsely represented in Box 31 of the HCFA-1500 forms that Miranda-Genaro had personally performed or directly supervised the physical therapy services.

132.    In fact, Miranda-Genaro – who was in his mid-to-late 80s at the time – did not legitimately perform or directly supervise the physical therapy services in the

claims identified in Exhibits "1" – "2", and could not have legitimately performed or directly supervised the physical therapy services.

133.    For example:

(i)     On January 7, 2020, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 29 hours of services that were provided to at least 14 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and a third clinic called Waters Medical Rehab ("Waters Medical").

(ii)    On June 17, 2020, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 29 hours of services that were provided to at least 12 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(iii)   On November 13, 2020, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 27 hours of services that were provided to at least 11 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(iv)    On January 4, 2021, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 33 hours of services that were provided to at least 13 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(v)     On January 11, 2021, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 38 hours of services that were provided to at least 16 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(vi)    On February 9, 2022, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 30 hours of services that were provided to at least 12 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(vii)   On May 6, 2022, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 24 hours of services that were provided to at least 10 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(viii)  On June 1, 2022, Miranda-Genaro purported to personally perform – or

at least directly supervise – at least 22 hours of services that were provided to at least nine Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(ix)    On December 15, 2022, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 27 hours of services that were provided to at least 14 Insureds at two different locations, including Sunsky and Tampa Bay Medical.

(x)    On January 23, 2023, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 29 hours of services that were provided to at least 12 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(xi)    On February 24, 2023, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 39 hours of services that were provided to at least 16 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(xii)    On March 2, 2023, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 31 hours of services that were provided to at least 14 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(xiii)    On April 3, 2023, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 25 hours of services that were provided to at least 13 Insureds at two different locations, including Sunsky and Tampa Bay Medical.

(xiv)    On April 5, 2023, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 32 hours of services that were provided to at least 14 Insureds at three different locations, including Sunsky, Tampa Bay Medical, and Waters Medical.

(xv)    On April 4, 2024, Miranda-Genaro purported to personally perform – or at least directly supervise – at least 15 hours of services that were provided to at least eight Insureds at two different locations, including Sunsky and Tampa Bay Medical.

134.    These are only representative examples. In the claims for physical therapy services that are identified in Exhibits "1" – "2", the Defendants routinely

falsely represented that Miranda-Genaro had performed – or at least directly supervised – an impossible number of physical therapy services on individual dates, considering the amount of services he simultaneously was purporting to perform or directly supervise at other health care clinics at multiple locations on those same dates.

135.    It is impossible that Miranda-Genaro routinely performed or directly supervised such a high volume of services, typically at multiple locations, on individual dates.

136.    Furthermore, upon information and belief, the fraudulent billing for physical therapy services that the Defendants submitted to GEICO constituted only a fraction of the total fraudulent billing for physical therapy services that they submitted to all of the automobile insurers in the Florida automobile insurance market.

137.    GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

138.    It is improbable, to the point of impossibility, that the Defendants only submitted fraudulent billing to GEICO and that they did not simultaneously bill other automobile insurers within the Florida market.

139.    Thus, upon information and belief, the impossible number of physical therapy services that Miranda-Genaro purported to perform or directly supervise for GEICO Insureds at Sunsky, Tampa Bay Medical, and other locations on individual dates of service – including but not limited to the dates of service identified above – constituted only a fraction of the total number of physical therapy services that Miranda-Genaro purported to perform or directly supervise on those same dates of

service.

140.   In the claims for "physical therapy" services identified in Exhibits "1" –

"2", the Defendants routinely falsely misrepresented that the physical therapy services

were lawfully provided and reimbursable, when, in fact, they were neither lawfully

provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent
        that they were performed at all – by massage therapists and
        unsupervised/unlicensed individuals, in contravention of Florida law;

(ii)    Sunsky and Tampa Bay Medical could not lawfully recover PIP Benefits
        for the purported physical therapy services, because the services were
        performed by massage therapists and unsupervised/unlicensed
        individuals, and because the clinics operated in violation of Florida law;
        and

(iii)   the Defendants systematically fraudulently misrepresented and
        concealed the identities of the individuals who either personally
        performed or directly supervised the putative physical therapy services.

**4.     The Defendants' Violations of the False and Fraudulent Insurance Claims
         Statute**

141.   The Defendants knew that, if they made legitimate efforts to collect PIP

deductibles from their patients, it would impede their ability to execute on the

fraudulent and unlawful scheme described herein. For instance, if the Defendants

made legitimate efforts to collect deductibles, Insureds would be less likely to continue

presenting to Tampa Bay Medical and Sunsky on a regular basis for medically

unnecessary treatment.

142.   Accordingly, and as part and parcel of their fraudulent and unlawful

schemes, the Defendants unlawfully engaged in the general business practice of

waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

143.   In keeping with this fact, in almost all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through Sunsky and Tampa Bay Medical to GEICO for the Defendants' Fraudulent Services, the Defendants represented that they did not collect any money, whether it be a co-payment or a deductible, from the Insureds.

144.   In the claims identified in Exhibits "1" – 2", the Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, when, in fact, they were neither lawfully provided nor reimbursable, because the Defendants operated in violation of the False and Fraudulent Insurance Claims Statute.

**5.     The Unlawful Operation of Tampa Bay Medical and Sunsky in Violation of the Clinic Act**

145.   Because Tampa Bay Medical and Sunsky were health care clinics that were subject to the Clinic Act: (i) Amaro could not operate Tampa Bay Medical; and (ii) Pujols could not operate Sunsky, unless the clinics employed licensed physicians as their respective medical directors, who actually performed the required duties of clinic medical directors.

146.   However, if Amaro and Pujols recruited legitimate physicians to serve as the Tampa Bay Medical and Sunsky's respective medical directors, any such legitimate physicians actually would be obligated to fulfill the statutory and regulatory

53

requirements applicable to clinic medical directors, which would impede the Defendants' fraudulent and unlawful schemes.

147. Accordingly:

(i) Amaro recruited Miranda-Genaro and then Boddie, licensed physicians, who were willing to falsely pose as the legitimate medical directors at Tampa Bay Medical, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical director at the clinic; and

(ii) Pujols recruited Miranda-Genaro and then Logrono, licensed physicians, who were willing to falsely pose as the legitimate medical directors at Sunsky, but who – in actuality – would not even attempt to fulfill the statutory requirements applicable to a clinic medical at the clinic.

148. However, Miranda-Genaro, Boddie, and Logrono were never genuine medical directors for Tampa Bay Medical and Sunksy, respectively.

149. Instead, from the beginning of Miranda-Genaro, Boddie, and Logrono's respective associations with Tampa Bay Medical and Sunksy, they ceded all day-to-day decision-making and oversight regarding health care services to Amaro and Pujols, respectively.

150. In keeping with the fact that Miranda-Genaro, Boddie, and Logrono were never genuine medical directors at Tampa Bay Medical and Sunsky, respectively, Miranda-Genaro, Boddie, and Logrono never legitimately conducted systematic reviews of each of Tampa Bay Medical and Sunsky's respective billings to ensure that the billings were not fraudulent or unlawful, and instead permitted Tampa Bay Medical and Sunsky to operate in the fraudulent and unlawful manner described herein.

151.    Moreover, Miranda-Genaro, Boddie, and Logrono never ensured that all practitioners providing health care services at Tampa Bay Medical and Sunsky had active appropriate certification or licensure for the level of care being provided, and instead permitted Tampa Bay Medical and Sunsky to unlawfully bill for "physical therapy" services performed by massage therapists and unlicensed/unsupervised individuals.

152.    Furthermore, Miranda-Genaro, Boddie, and Logrono never legitimately served as clinic records owners at Tampa Bay Medical and Sunsky, respectively. Had they done so, they would have – among other things – taken corrective action to address the fact that medical directors at Tampa Bay Medical and Sunsky routinely misrepresented the identities of the practitioners who actually performed, or directly supervised, the purported "physical therapy" services at Tampa Bay Medical and Sunsky.

153.    In addition, though no Florida health care clinic may operate without the day-to-day supervision of a physician-medical director, Miranda-Genaro, Boddie, and Logrono never provided legitimate, day-to-day supervision at Tampa Bay Medical and Sunksy, respectively, and – in fact – only occasionally were present at the respective clinics, if at all.

154.    What is more, between August 11, 2023 and December 2023, Tampa Bay Medical did not have a clinic license at all, inasmuch as its license expired on August 11, 2023, and it did not obtain a new license until December 2023. Even so, during the period from August 11, 2023 to December 2023, Tampa Bay Medical, Amaro, and

Miranda-Genaro submitted more than 1,000 individual PIP charges through Tampa Bay Medical to GEICO, despite the fact that – during that period – Tampa Bay Medical was operating without a valid clinic license.

155.   In the claims identified in Exhibits "1" – "2", the Defendants falsely represented that Tampa Bay Medical and Sunsky were in compliance with the Clinic Act and eligible to receive PIP reimbursement.

156.   In fact, Tampa Bay Medical and Sunsky were not in compliance with the Clinic Act, and as a result they were not eligible to receive PIP reimbursement.

## III.   The Fraudulent and Unlawful Claims the Defendants Submitted to GEICO

157.   To support their fraudulent charges, the respective Defendants systematically submitted thousands of HCFA-1500 forms and treatment reports through Tampa Bay Medical and Sunsky – containing thousands of individual charges – seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

158.   The claims that the Defendants submitted – or caused to be submitted – to GEICO were false and misleading in the following, material respects:

(i)   The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance, when, in fact, they were not.

(ii)   The HCFA-1500 forms and treatment reports submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when, in fact, they were not.

(iii)   The HCFA-1500 forms and treatment reports submitted by the

56

Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services were actually performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to provide medically necessary treatment to Insureds.

(iv)   The HCFA-1500 forms and treatment reports submitted by and on behalf of the Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

159.   The Defendants were legally and ethically obligated to act honestly and with integrity in connection with their provision of the Fraudulent Services and their submission of charges to GEICO.

160.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and have gone to great lengths to accomplish this concealment.

161.   For instance, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that the Defendants operated in violation of Florida law and were, therefore, ineligible to collect PIP Benefits in the first instance.

162.   The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary, and frequently never were performed in the first instance.

163.   The Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services oftentimes were

unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

164.    The Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

165.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to – and did – cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,400,000.00.

166.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
### Against Tampa Bay Medical
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

167.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-166, above.

168.    There is an actual case and controversy between GEICO and Tampa Bay Medical regarding more $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

169.   Tampa Bay Medical has no right to receive payment for any pending bills submitted to GEICO because Tampa Bay Medical was unlawfully operated in violation Florida law.

170.   Tampa Bay Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were neither lawfully provided nor lawfully billed to GEICO.

171.   Tampa Bay Medical has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

172.   Tampa Bay Medical has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services were never provided in the first instance.

173.   Tampa Bay Medical has no right to receive payment for any pending bills submitted to GEICO because the billing codes for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

174.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Tampa Bay Medical has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against Amaro
### (Violation of RICO, 18 U.S.C. § 1962(c))

175.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-166, above.

176.   Tampa Bay Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

177.   Amaro knowingly conducted and/or participated, directly or indirectly, in the conduct of Tampa Bay Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Tampa Bay Medical was not eligible to receive under the No-Fault Law because: (i) Tampa Bay Medical was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were neither lawfully provided nor billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

60

178.   A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

179.   Tampa Bay Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Amaro operated Tampa Bay Medical, inasmuch as Tampa Bay Medical was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Tampa Bay Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Tampa Bay Medical and Amaro continue to attempt collection on the fraudulent billing submitted through Tampa Bay Medical to the present day.

180.   Tampa Bay Medical is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Tampa Bay Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent PIP billing.

181.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $780,000.00 pursuant to the fraudulent bills submitted through Tampa Bay Medical

182.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief the Court deems just, proper, and equitable.

## THIRD CAUSE OF ACTION
### Against Amaro, Miranda-Genaro, and Boddie
### (Violation of RICO, 18 U.S.C. § 1962(d))

183.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-166, above.

184.   Tampa Bay Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

185.   Amaro, Miranda-Genaro, and Boddie were employed by – or associated with – the Tampa Bay Medical enterprise.

186.   Amaro, Miranda-Genaro, and Boddie knowingly have agreed, combined and conspired to conduct and/or participate in, directly or indirectly, in the conduct of Tampa Bay Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or cause to be submitted – thousands of fraudulent charges on a continuous basis for over five years seeking payments that Tampa Bay Medical was not eligible to receive under the No-Fault Law because: (i) Tampa Bay Medical was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent

protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

187.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

188.    Amaro and Miranda-Genaro knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

189.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $780,000.00 pursuant to the fraudulent bills submitted through the Tampa Bay Medical enterprise.

190.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just, proper, and equitable.

## FOURTH CAUSE OF ACTION
### Against Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie
### (Under Fla. Stat. § 501.201 et. seq.)

191.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-166, above.

192.    Tampa Bay Medical, Amaro, and Miranda-Genaro are actively engaged in trade and commerce in the State of Florida.

193.    GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

194.    Tampa Bay Medical, Amaro, and Miranda-Genaro engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

195.    The bills and supporting documents submitted – or caused to be submitted – by Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie were fraudulent in that they misrepresented: (i) Tampa Bay Medical's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

196.    Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie has been materially injurious to GEICO and its Insureds.

197.    The conduct of Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie was the actual and proximate cause of the damages sustained by GEICO.

198.    Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie's unfair and deceptive acts have caused GEICO to sustain damages of at least $780,000.00.

199.    By reason of Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## FIFTH CAUSE OF ACTION
### Against Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie
### (Common Law Fraud)

200.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-166, above.

201.    Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent bills through Tampa Bay Medical for the Fraudulent Services.

202.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Tampa Bay Medical was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for

PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when, in many cases, they were not actually performed.

203.    Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Tampa Bay Medical that were not reimbursable.

204.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $780,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie through Tampa Bay Medical.

205.    Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

206.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just, proper, and equitable.

### SIXTH CAUSE OF ACTION
### Against Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie
### (Unjust Enrichment)

207.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-166, above.

208.   As set forth above, Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

209.   When GEICO paid the bills and charges submitted by Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie through Tampa Bay Medical, it reasonably believed that it was legally obligated to make such payments based on Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie's improper, unlawful, and/or unjust acts.

210.   Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

211.   Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

212.   By reason of the above, Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie have been unjustly enriched in an amount to be determined at trial, but in no event less than $780,000.00.

### SEVENTH CAUSE OF ACTION
### Against Sunsky
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

213.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-166, above.

214.   There is an actual case in controversy between GEICO and Sunsky regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

215.   Sunsky has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of Florida law.

216.   Sunsky has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

217.   Sunsky has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them.

218.   Sunsky has no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

219.   Sunsky has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

220.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Sunsky has no right to receive payment for any pending bills submitted to GEICO.

**EIGHTH CAUSE OF ACTION**
**Against Pujols**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

221.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-166, above.

222.   Sunsky is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

223.   Pujols knowingly conducted and/or participated, directly or indirectly, in the conduct of Sunsky's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or caused to be submitted – hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Sunsky was not eligible to receive under the No-Fault Law because: (i) Sunsky was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were

69

provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

224.    A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "2".

225.    Sunsky's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Pujols operated Sunsky, inasmuch as Sunsky was not engaged in legitimate health care practice, and acts of mail fraud were, therefore, essential in order for Sunsky to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Pujols continues to attempt collection on the fraudulent billing submitted through Sunsky to the present day.

226.    Sunsky is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Sunsky in pursuit of inherently

unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

227.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $622,000.00 pursuant to the fraudulent bills submitted through the Sunsky enterprise.

228.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just, proper, and equitable.

## NINTH CAUSE OF ACTION
### Against Pujols, Miranda-Genaro, and Logrono
### (Violation of RICO, 18 U.S.C. § 1962(d))

229.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-166, above.

230.   Sunsky is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

231.   Pujols, Miranda-Genaro, and Logrono were employed by – or associated with – the Sunsky enterprise.

232.   Pujols, Miranda-Genaro, and Logrono knowingly have agreed, combined and conspired to conduct and/or participate in, directly or indirectly, the conduct of Sunsky's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit – or caused to be submitted -- hundreds of fraudulent charges on a continuous basis for over four years seeking payments that

Sunsky was not eligible to receive under the No-Fault Laws because: (i) Sunsky was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to provide medically necessary treatment to the Insureds who purportedly were subjected to them; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

233. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

234. Pujols, Miranda-Genaro, and Logrono knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

235.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $622,000.00 pursuant to the fraudulent bills submitted through the Sunsky enterprise.

236.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), along with such other and further relief as this Court deems just, proper, and equitable.

## TENTH CAUSE OF ACTION
### Against Sunsky, Pujols, Miranda-Genaro, and Logrono
### (Under Fla. Stat. § 501.201 et. seq.)

237.   GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-166, above.

238.   Sunsky, Pujols, Miranda-Genaro, and Logrono are actively engaged in trade and commerce in the State of Florida.

239.   GEICO and its Insureds are "consumers" as defined by Fla. Stat. § 501.203.

240.   Sunsky, Pujols, Miranda-Genaro, and Logrono engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally obtain PIP Benefits from GEICO.

241.   The bills and supporting documents submitted – or caused to be submitted – to GEICO by Sunsky, Pujols, Miranda-Genaro, and Logrono were fraudulent in that they misrepresented: (i) Sunsky's eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to

GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

242. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Sunsky, Pujols, Miranda-Genaro, and Logrono has been materially injurious to GEICO and its Insureds.

243. The conduct of Sunsky, Pujols, Miranda-Genaro, and Logrono was the actual and proximate cause of the damages sustained by GEICO.

244. Sunsky, Pujols, Miranda-Genaro, and Logrono's unfair and deceptive acts have caused GEICO to sustain damages of at least $622,000.00.

245. By reason of Sunsky, Pujols, Miranda-Genaro, and Logrono's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. § 501.211(2).

## ELEVENTH CAUSE OF ACTION
### Against Sunsky, Pujols, Miranda-Genaro, and Logrono
### (Common Law Fraud)

246. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1-166, above.

247. Sunsky, Pujols, Miranda-Genaro, and Logrono intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of submitting – or causing to be submitted – thousands of fraudulent charges through Sunsky for the Fraudulent Services.

248.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Sunsky was in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact, it was not; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when, in fact, they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when, in many cases, they were not actually performed.

249.    Sunsky, Pujols, Miranda-Genaro, and Logrono intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Sunsky that were not reimbursable.

250.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $622,000.00 pursuant to the fraudulent bills that were submitted – or caused to be submitted – by  Sunsky, Pujols, Miranda-Genaro, and Logrono.

251.    Sunsky, Pujols, Miranda-Genaro, and Logrono's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

252.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, along with such other and further relief as this Court deems just, proper, and equitable.

**TWELFTH CAUSE OF ACTION**
**Against Sunsky, Pujols, Miranda-Genaro, and Logrono**
**(Unjust Enrichment)**

253.    GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1-166, above.

254.    As set forth above, Sunsky, Pujols, Miranda-Genaro, and Logrono have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

255.    When GEICO paid the bills and charges submitted – or caused to be submitted – by Sunsky, Pujols, Miranda-Genaro, and Logrono through Sunsky, it reasonably believed that it was legally obligated to make such payments based on Sunsky, Pujols, Miranda-Genaro, and Logrono's improper, unlawful, and/or unjust acts.

256.    Sunsky, Pujols, Miranda-Genaro, and Logrono have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Sunsky, Pujols, Miranda-Genaro, and Logrono voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

257.    Sunsky, Pujols, Miranda-Genaro, and Logrono's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

258.   By reason of the above, Sunsky, Pujols, Miranda-Genaro, and Logrono have been unjustly enriched in an amount to be determined at trial, but in no event less than $622,000.00.

**JURY DEMAND**

259.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.   On the First Cause of Action against Tampa Bay Medical, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Tampa Bay Medical has no right to receive payment for any pending bills submitted to GEICO;

B.   On the Second Cause of Action against Amaro, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $780,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.   On the Third Cause of Action against Amaro, Miranda-Genaro, and Boddie, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $780,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie, compensatory damages in an amount to be determined at trial but in excess of $780,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

E.      On the Fifth Cause of Action against Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie,  compensatory damages in an amount to be determined at trial but in excess of $780,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just, proper, and equitable.

F.      On the Sixth Cause of Action against Tampa Bay Medical, Amaro, Miranda-Genaro, and Boddie, more than $780,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just, proper, and equitable.

G.      On the Seventh Cause of Action against Sunsky, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Sunsky has no right to receive payment for any pending bills submitted to GEICO;

H.      On the Eighth Cause of Action against Pujols, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $622,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Pujols, Miranda-Genaro, and Logrono, compensatory damages in favor of GEICO in an amount to be determined

at trial but in excess of $622,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  J. On the Tenth Cause of Action against Sunsky, Pujols, Miranda-Genaro, and Logrono, compensatory damages in an amount to be determined at trial but in excess of $622,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

  K. On the Eleventh Cause of Action against Sunsky, Pujols, Miranda-Genaro, and Logrono, compensatory damages in an amount to be determined at trial but in excess of $622,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just, proper, and equitable; and

  L. On the Twelfth Cause of Action against Sunsky, Pujols, Miranda-Genaro, and Logrono, more than $622,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just, proper, and equitable.

Dated: March 2, 2026

/s/ Max Gershenoff
Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen L. Wenger (FBN 92136)
Katherine F. Gonzalez (FBN 1072847)
RIVKIN RADLER, LLP
926 RXR Plaza
Uniondale, New York 11550
Phone: (516) 357-3000

-and-

Riverplace Tower
1301 Riverplace Blvd., Suite 1000
Jacksonville, Florida 32207
Phone: (904) 791-8948
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com
Katherine.Gonzalez@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO Insurance Company, and GEICO Casualty Co.*